UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

UNITED STATES OF AMERICA    )
                            )
            v.              )          1:12-cr-00188-JAW-04
                            )
ANDREW J. ZARAUSKAS         )

**ORDER DENYING DEFENDANT'S MOTION FOR NEW TRIAL**

Following a verdict of guilty on a number of criminal offenses, Andrew J. Zarauskas seeks a new trial, claiming that the prosecutors improperly commented on his Fifth Amendment privilege against self-incrimination and his right to counsel, and that the prosecutors incorrectly argued that he must prove his own innocence. The Court concludes that the prosecutor's comments were not inappropriate and denies Mr. Zarauskas' motion.

I.    **LEGAL STANDARD**

The court may grant a new trial in a criminal case "if the interest of justice so requires." FED. R. CRIM. P. 33(a). "Ordering retrial is a rare remedy," used only "where a miscarriage of justice would otherwise occur, or where the evidence weighs heavily against the jury's verdict." *United States v. Vázquez-Botet*, 532 F.3d 37, 59 (1st Cir. 2008).

II.   **FACTS**

A.    **Indictment, Trial and Verdict**

On November 14, 2012, a federal grand jury indicted Mr. Zarauskas on one count of conspiracy to smuggle narwhal tusks, *Indictment* at 1-8 (ECF No. 2); one

count of conspiracy to commit money laundering, *id.* at 8-12; two counts of smuggling narwhal tusks, *id.* at 12-13; and two counts of money laundering. *Id.* at 14-15. On February 14, 2014, following a four day trial, a jury convicted Mr. Zarauskas on all counts. *Jury Verdict Form* (ECF No. 132). On May 2, 2014, Mr. Zarauskas moved for a new trial.[1] *Mot. for New Trial* (ECF No. 158) (*Def.'s Mot.*). The Government opposed the motion on May 22, 2014. *Gov't Opp'n to Def.'s Mot. for New Trial* (ECF No. 162) (*Gov't Opp'n*). After the Court granted several extensions, Mr. Zarauskas replied to the opposition on June 12, 2014. *Def.'s Reply to Gov't Opp'n to Mot. for New Trial* (ECF No. 165) (*Def.'s Reply*).

### B.    The Case Against Andrew Zarauskas: An Overview

A narwhal is a medium-sized toothed whale that lives in the Artic. *Indictment* at 2; *1 Tr. of Proceedings* 22:22-25 (ECF No. 140) (Feb. 11, 2014) (*1 Trial Tr.*). The narwhal is characterized by a conspicuous tusk or tooth. *2 Tr. of Proceedings* 178:1-11, 179:19-180:15 (ECF No. 141) (Feb. 12, 2014) (*2 Trial Tr.*). Some people prize and collect narwhal tusks and the tusks sell for as much as $70 an inch. *See, e.g., 4 Tr. of Proceedings* 566:6-8 (ECF No. 147) (Feb. 14, 2014) (*4 Trial Tr.*); *Gov't Ex.* 135 at 42:5-8. Narwhals are marine mammals protected by the treaty known as the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES), Mar. 3, 1973, 27 U.S.T. 1087, T.I.A.S. No. 8249, and by federal law under the Marine Mammal Protection Act (MMPA), 16 U.S.C. §§ 1361 *et seq.* CITES is implemented in

---

[1]    A motion for new trial would normally be due within fourteen days of the verdict, Fed. R. Crim. P. 33(b)(2), but the Court granted Mr. Zarauskas several extensions of that deadline. *Order* (ECF No. 136); *Order* (ECF No. 145); *Order* (ECF No. 159).

the United States by the Endangered Species Act (ESA), 16 U.S.C. §§ 1531 *et seq*. The ESA criminalizes violations of CITES, including the trading or possessing of narwhal tusks. *Id*. § 1538(c)(1). Similarly, the MMPA criminalizes the importation of narwhal tusks. 16 U.S.C. § 1372(a)(2)(B). The smuggling statute makes it unlawful to fraudulently or knowingly import narwhal tusks or bring them into the United States, 18 U.S.C. § 545, and the money laundering statute prohibits the transfer of money from the United States to or through a place outside the United States with the intent to promote smuggling. 18 U.S.C. § 1956(a)(2)(A).

At some point, federal officials began to investigate a narwhal smuggling operation that originated in Canada and was run by Gregory and Nina Logan. *Indictment* at 5. The investigation revealed that the Logans had smuggled narwhal tusks into the United States through the Milltown Port of Entry in Calais, Maine. *Id*. Mr. Logan would take the tusks to Federal Express in Bangor, Maine, and ship them to customers throughout the United States, including Mr. Zarauskas. *Id*. at 6. The federal agents learned that Mr. Zarauskas had begun purchasing the tusks in 2002 and had continued to purchase them until 2010. *2 Trial Tr*. 100:1-25. Mr. Zarauskas, who not only ran a construction business but also collected and sold antiques, would resell the tusks, primarily at flea markets. *Id*. 217:17; *1 Trial Tr*. 31:5-11, 64:13-21. The investigation established that Mr. Zarauskas paid the Logans for the tusks by issuing checks, money orders and international money orders. *See, e.g., 3 Tr. of Proceedings* 336:1-7, 406:13-22, 408:22-409:7 (ECF No. 142) (Feb. 13, 2014) (*3 Trial Tr*.).

Federal officials knew Mr. Zarauskas because he had approached them around 2003 to provide information against a resident of Nantucket, Massachusetts, who had been involved in the illegal purchase of sperm whale teeth. *1 Trial Tr.* 59:13-62:4. Over the next several years, Mr. Zarauskas provided extensive information to federal law enforcement officers about the illegal sperm whale tooth trade, leading to the investigation and conviction of numerous individuals. *Id.* 66:2-11; *2 Trial Tr.* 153:1-8.

On February 17, 2010, federal agents decided to meet with Mr. Zarauskas at the Café Vivaldi in Union, New Jersey, and confront him with his involvement in the Logan narwhal smuggling operation. *1 Trial Tr.* 66:15-68:5.

## C. The Café Vivaldi Interview of Mr. Zarauskas

Mr. Zarauskas did not testify at trial. However, at trial, the Government introduced an audio recording, without objection, of an extensive pre-indictment interview of Mr. Zarauskas that occurred on February 17, 2010 by federal agents at a restaurant in Union, New Jersey. *Id.* 41:14-15, 42:9-10, 70:18-71:18. Special Agents Guidera and Holmes' interview of Mr. Zarauskas at the Café Vivaldi was over two hours long. *Id.* 67:13-14, 68:2-5, 69:7-11. As the agents had been working with Mr. Zarauskas as an informant on a different smuggling case, it was Mr. Zarauskas' understanding that the purpose of the interview was to discuss that case. *Id.* 67:19-68:1.

However, as the agents planned, the interview turned to Mr. Zarauskas' own alleged smuggling of narwhal tusks. Much of the dispute turns on the Government's

comments during closing argument about what Mr. Zarauskas did not say during the Café Vivaldi interview.  Mr. Zarauskas, who was talkative and expansive during the first part of the interview, became noticeably reticent and nervous as the agents shifted their focus to him.  *2 Trial Tr.* 113:20-114:15.  Significantly, even though the agents were clearly pressing him for an explanation of his role in a narwhal tusk smuggling operation involving Greg and Nina Logan, Mr. Zarauskas never denied that he was involved in the Logan operation.  *Id.* 114:19-22, 114:25-115:2.

### D.    The Government's Opening Statement

During the Government's opening statement, the federal prosecutor discussed conversations that the government agents had with Mr. Zarauskas, but he did not specifically refer to the Café Vivaldi interview.  *See 1 Trial Tr.* 22:10-30:3.

### E.    Mr. Zarauskas' Opening Statement Regarding the Café Vivaldi Interview

During Mr. Zarauskas' opening statement, defense counsel previewed this interview in the context of Mr. Zarauskas' theory of the case:

> You're going to hear a conversation that took place in a café in New Jersey.  Mr. Zarauskas was invited to the café by the agents.  They recorded it.  You'll hear it.  The defense will not object to you hearing it -- Mr. Zarauskas' actual words, the agents' actual words.  Mr. Zarauskas wants to be helpful to the agents.  As you listen to the evidence, please keep in mind the actual words and the actual sentiment behind them, not any particular spin put on them by government agents because you'll hear government agents on this tape, and they'll be saying to Mr. Zarauskas stuff like, well, you must have known or how was he getting them across.  And you'll hear Mr. Zarauskas try to be helpful, as a good citizen would.

> But listen to the words actually coming out of Mr. Zarauskas' mouth.  Listen to the words actually coming out of the agents' mouth.  Don't listen to the words coming out of the attorneys' mouths about what it all meant.

*Id.* 33:19-34:9.

**F.    Trial Evidence**

On the first day of trial, the Government moved to admit and play to the jury an audiotape of the February 17, 2010 interview; Mr. Zarauskas did not object and the Court admitted an audiotape of the interview. *Id.* 70:18-71:18. In fact, the Government intended to play only select portions of the interview, but following an objection by defense counsel, the audiotape of the entire interview—all two hours and nine minutes—was played to the jury. *Id.* 75:10-77:10.

After playback of the recording finished, on February 12, 2014, the prosecutor had the following exchange with Special Agent Guidera:

> Q    Okay. What, if anything, did you observe about the defendant's body language during the interview?
>
> A    I observed it changing as we got into the topic of narwhals.
>
> Q    In what way did you observe it changing?
>
> A    Um, in that when we started the interview, um, he was very engaged. He was forward-sitting. He was -- was very engaged and calm, if you would.
>
> And as we got into the narwhal topics, he went from being open to more of a closed position and to sitting way back in his chair and tensing up with his hands, and I could see his -- his breathing go rapid and shallow, and he began grooming his face, and at the same time, he began to have sweat bead up on his forehead until it started to run down the side of his head -- face.
>
> Q    During the interview, was the temperature uncomfortable inside the Café Vivaldi?
>
> A    No, it wasn't.
>
> Q    During the interview, did the defendant ever say anything like you're accusing me of something I didn't do here?
>
> A    No, he didn't.

Q        Did he ever raise his voice at you?

A        He did not.

Q        Did he ever get mad at you or say that you misunderstood what happened?

A        No.

Q        Now, near the end --

MR. SMITH [Defense Counsel]: Objection, Your Honor.

*2 Trial Tr.* 114:1-115:4. After the Court overruled the objection, *id.* 115:18-24, the

direct examination continued:

Q        Special Agent Guidera, near the end of the interview, you and the defendant were discussing the possibility of looking at things that were currently in his home. Do you remember that?

A        I do.

Q        Okay. Did you ultimately go to the defendant's home?

A        Yes, we did.

Q        And I want to ask you a preface question because it's important. At the end of the tape, the defendant said something along the lines of it might be in my best interests to get an attorney. At that point, did he say that he was calling an attorney or wanted to talk to an attorney before it went any further?

A        No, he did not.

*Id.* 116:2-15.

## G.      The Closing Arguments

In his initial closing argument on February 14, 2014, the prosecutor made the

following statements:

It strikes me that when asked by federal agents to be interviewed, a person really has three choices: You can say no, thank you, I'd rather not talk; you can agree to be interviewed and tell the truth; you can agree to be interviewed and spin a web of inconsistent statements. You

heard the entire interview. You decide which choice the defendant made on February 17th, 2010.

*4 Trial Tr.* 564:9-15. There was no objection to this part of the prosecutor's argument.

In his closing argument, defense counsel responded:

The government insists over and over that the defendant knew, the defendant knew, the defendant knew, kept on repeating that phrase. If they repeat it often enough, maybe it'll be true, but that's not the way this court works. They have to show evidence. They have to show evidence that he knew. And they have shown not one iota, not one shred, not one little word that says that Mr. Zarauskas, Andy, knew that those tusks were coming from Canada -- not one word, not one e-mail, not one telephone call, not one conversation.

. . .

And then the government acts surprised and says you should be suspicious when the -- the agents suddenly spring on Andy that he's the focus of the investigation. What's the human reaction? You've got three government agents and one or more of them are from Canada sitting there suddenly accusing you of being a tusk smuggler. What are you going to do?

And they want to stretch that -- those natural human reactions into suddenly being accused of these things into some sort of guilt, some sort of guilty statement. But look at that tape. Not once during that entire tape does Andy Zarauskas says -- ever say, yeah, I knew he was bringing them in from Canada.

*Id.* 576:18-577:1, 578:4-15.

In rebuttal, the prosecutor made the following statements:

Now, the defendant says there's not one shred of evidence, not one shred, that the defendant knew that these tusks were illegal. Well, if he thought they were illegal -- or if they thought -- if he thought they were legal, why couldn't he give a straight answer? Two hours and nine minutes, not once did he raise his voice or say, I didn't do what you're saying I did.

MR. SMITH [Defense Counsel]: Objection.

*Id.* 589:7-14. Mr. Smith and Assistant United States Attorney (AUSA) Nelson

approached sidebar and Mr. Smith first objected on the ground that by this

statement, the Government had "just commented on the burden of proof and it has tried to shift that burden of proof to Mr. Zarauskas." *Id.* 589:20-22. Mr. Smith then turned to the argument that AUSA Nelson was "commenting on [the] Fifth Amendment." *Id.* 590:18-19.

Following the objection, the prosecutor continued:

> I would ask you to do the very same thing that Mr. Smith asked you to do. Ask yourself, if you were in that situation where you believed you were being falsely accused, what would you do? What would you say? If he thought these tusks were from Maine, why did he keep telling the agents that it was perfectly legal to sell narwhal tusks in Canada? They're from Maine. Who cares? If he thought they were from Maine, then why did he tell the agents, I don't know how he got them across the border? He said maybe it was a logging truck, or maybe it was a boat. The fact that the defendant didn't know how Greg Logan got them across the border does not change the fact that he knew that they came across the border.

*Id.* 592:15-593:2.

## III.    POSITION OF THE PARTIES

### A.    Mr. Zarauskas' Motion

Mr. Zarauskas argues that it is proper to overturn a conviction "based on prosecutorial comment upon the Defendant's right to remain silent." *Def.'s Mot.* at 7 (citing *United States v. Sepulveda*, 15 F.3d 1161 (1st Cir. 1993)). He notes that, unlike the defense counsel in *Sepulveda*, his defense counsel "objected twice to prosecutorial comment on the Defendant's silence." *Id.* at 11. Mr. Zarauskas further argues, by way of quoting portions of the trial transcript, that the Government's comments shifted the burden of proof to him to prove his innocence. *Id.* at 2, 4 (citing *2 Trial Tr.* 115:11-17; *4 Trial Tr.* 589:20-22). Mr. Zarauskas also offers two additional cases in which courts reviewed prosecutorial comment on a defendant's silence. *Id.* at 12-

15 (citing *Greer v. Miller*, 483 U.S. 756 (1987); *United States v. Bush*, 940 F.2d 669 (9th Cir. 1991)). Mr. Zarauskas concludes that the prosecutor's comments were improper and violated "the bright line" established in *Griffin v. California*, 380 U.S. 609 (1965). *Id.* at 15. He demands a new trial. *Id.*

### B. The Government's Opposition

The Government acknowledges that the Self-Incrimination Clause of the Fifth Amendment forbids commentary on a defendant's decision not to testify at trial. *Gov't's Opp'n* at 3. However, the Government insists that the prosecutor may "comment on the evidence presented, or lack thereof, when those comments are focused on the particular evidence rather than on the Defendant's decision not to testify at trial." *Id.* at 4. The Government also frames its comments as a response to Mr. Zarauskas' theory of the case that: (1) Mr. Zarauskas was unaware that the Logans were smuggling narwhal tusks from Canada to the United States; (2) Mr. Zarauskas was helpful and cooperative during the interview; and (3) the Government's case was built on a manipulation or misinterpretation of Mr. Zarauskas' statements. *Id.*

Addressing Special Agent Guidera's comments on the interview first, the Government argues that his testimony reflects his perception of Mr. Zarauskas' body language and demeanor during the interview. *Id.* at 6. It frames Special Agent Guidera's testimony as an "appraisal of what the Defendant said." *Id.* The Government also points out that, although the jury could hear the audio of the interview, it could not see how Mr. Zarauskas looked during the interview; Special Agent Guidera's testimony was, according to the Government, meant to fill in that

hole. *Id.* Furthermore, it views the comment about Mr. Zarauskas' lack of a denial as appropriate given Mr. Zarauskas' claim that he was helpful and cooperative to the agents during the interview. *Id.*

The Government turns next to the question and answer about Mr. Zarauskas' brief suggestion that he might want to get an attorney. *Id.* at 7. Here, the Government simply asserts that this exchange had nothing to do with Mr. Zarauskas' silence during the interview or at trial. *Id.* at 7-8. The Government also denies that this was an improper reference to Mr. Zarauskas' Sixth Amendment right to counsel, because Mr. Zarauskas never actually invoked the right. *Id.* at 8 n.1.

Next, the Government argues that its comments during closing argument were appropriate. *Id.* at 8. This is so, it suggests, because the statements during closing argument to which Mr. Zarauskas objected did not reference anything about Mr. Zarauskas' choice not to testify; rather, they were a comment on the jury's role in determining credibility. *Id.*

The Government argues that its statements in its rebuttal argument were a proper response to an argument raised in Mr. Zarauskas' closing. *Id.* at 9. In particular, the Government views it as a proper response to Mr. Zarauskas' claim that the Government had failed to put forth sufficient evidence of Mr. Zarauskas' knowledge. *Id.* It denies that its argument was intended as a comment on Mr. Zarauskas' silence, and that it could not reasonably be perceived as such. *Id.* at 10. Instead, the Government frames the rebuttal statements as a commentary on "the evidence produced at trial, and was in direct response to statements made by the

Defendant during his summation." *Id.* This, it contends, goes to the plausibility of Mr. Zarauskas' theory of the case. *Id.* at 10-11. Finally, the Government contends, in the alternative, that if the Court "interprets this statement to be a comment on Defendant's silence, any error resulting from the testimony was harmless." *Id.* at 11 (citing *United States v. Rodríguez-Vélez*, 597 F.3d 32, 44 (1st Cir. 2010)).

### C.    Mr. Zarauskas' Reply

In reply to the Government's opposition, Mr. Zarauskas argues that the Government's testimony and argument, taken in the aggregate, amounted to a comment on his choice to remain silent at the interview. *Def.'s Reply* at 2-5. Citing *United States v. Manning*, 23 F.3d 570 (1st Cir. 1994), he argues that all four instances of the Government's conduct (i.e., (1) Special Agent Guidera's testimony regarding the interview; (2) Special Agent Guidera's testimony regarding Mr. Zarauskas' right to counsel; (3) the Government's closing argument; and (4) the Government's rebuttal argument) were "part of a larger pattern," made more egregious by the fact that, in his opinion, the Government highlighted his silence during its rebuttal argument, when it would have the "last word." *Id.* at 5 (citing *Manning*, 23 F.3d at 574).

Mr. Zarauskas also disputes the Government's position that Special Agent Guidera's testimony was meant to fill in the details of his demeanor and body language during the interview; he quotes the exchange between the prosecutor and Special Agent Guidera: "[Question:] During the interview, did the defendant ever say anything like you're accusing me of something I didn't do here? [Answer]: No, he didn't." *Id.* at 3 (quoting *2 Trial Tr.* 114:19-22). He views this exchange as an

argument or implication that Mr. Zarauskas had a burden to produce evidence or take the stand and prove his innocence. *Id.*

Mr. Zarauskas next argues that the Court's curative instruction in the rebuttal argument was insufficient. *Id.* at 6. Finally, he insists that "[t]he Government presented no evidence that the Defendant knew anything about" the illicit manner in which co-defendant Gregory Logan brought the narwhal tusks into the United States. *Id.* This argument appears to be directed at the Government's suggestion that the Court's putative error in permitting the prosecutor to comment on Mr. Zarauskas' silence was harmless in nature. *See id.*

## IV. DISCUSSION

### A. The Right to Counsel

It is difficult to understand the basis for Mr. Zarauskas' current contention that the federal prosecutors improperly commented on his right to counsel. Mr. Zarauskas has never claimed that he asserted a right to counsel during the interview, and as is plain from the interview itself, Mr. Zarauskas did not.

During trial, the prosecutor asked Special Agent Guidera whether Mr. Zarauskas made such a request during the interview, and Special Agent Guidera responded that Mr. Zarauskas had not. *1 Trial Tr.* 69:16-18. Later, Special Agent Guidera confirmed that toward the end of the interview, Mr. Zarauskas said "something along the lines of it might be in my best interests to get an attorney" but did not "say that he was calling an attorney or wanted to talk to an attorney before it went any further." *2 Trial Tr.* 116:10-15. Mr. Zarauskas now objects to these parts

of the Special Agent's testimony, arguing that the colloquies violated his right to counsel. *Def.'s Reply* at 4.

The Court disagrees. First, through Mr. Zarauskas' insistence, the entire interview was in evidence. This means that in testifying on these points, Special Agent Guidera was telling the jury what it already knew: (1) that Mr. Zarauskas had not requested a lawyer; and (2) that at the end of the interview, he suggested that it might be in his best interest to talk to an attorney but did not do so during the interview. Second, the Special Agent's testimony in general went to the overall circumstances under which Mr. Zarauskas made his extensive statement to law enforcement and its voluntariness. That Mr. Zarauskas did not request an attorney and only mentioned one obliquely toward the end of the interview tended to corroborate that his statements were not made under duress or coercion from law enforcement.[2] Third, the initial question was in the context of a series of questions directed to the voluntariness of the statement: whether the agents' sidearms were visible, whether other people were present in the restaurant, whether the agents and Mr. Zarauskas ordered any food or drink at the restaurant, whether he had access to a cellphone during the interview, whether he asked the agents to stop the interview, whether they made any promises to him during the interview, whether they tried to trick him into talking them, whether he appeared to be under the influence of drugs

---

[2] As explained, the answers elicited from the prosecutor were intended, in part, to establish that Mr. Zarauskas' statements at the Café Vivaldi were voluntary. A statement(s) by a defendant does not violate the Due Process Clause if it is voluntary, meaning that it was not induced from law enforcement through coercive tactics. *See Lisenba v. California*, 314 U.S. 219, 236-37 (1941). The common test, as articulated by the Supreme Court, is "'whether a defendant's will was overborne.'" *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

or alcohol, and whether he refused to answer any questions during the interview. *1 Trial Tr.* 68:14-70:17. The last question and response addressed a statement that Mr. Zarauskas made at the end of the tape:

> Q. And I want to ask you a preface question because it's important. At the end of the tape, the defendant said something along the lines of it might be in my best interests to get an attorney. At that point, did he say that he was calling an attorney or wanted to talk to an attorney before it went any further?
>
> A. No, he did not.

*2 Trial Tr.* 116:9-15.

The Court remains uncertain why Mr. Zarauskas believes that these questions and answers violated his right to counsel. Special Agent Guidera merely clarified that Mr. Zarauskas did not ask for an attorney, not that he asked for one and that his request was denied. Never, at any point, did Mr. Zarauskas contend that the Government had violated his Sixth Amendment right to counsel.[3] Finally, Mr. Zarauskas objected to none of the colloquy about an attorney. The Court readily concludes there was no violation of Mr. Zarauskas' Sixth Amendment right to counsel and the prosecutor's closing argument was not improper.

---

[3] As the First Circuit has written, "[t]he Supreme Court has often explained that a criminal prosecution commences, and the right to counsel [under the Sixth Amendment] attaches, at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *United States v. Boskic*, 545 F.3d 69, 81 (1st Cir. 2008) (citations and internal quotations omitted). Here, the Café Vivaldi interview occurred over two years before the "initiation of adversary judicial criminal proceedings" against Mr. Zarauskas.

### B.    The Right to Remain Silent

#### 1.    Trial Testimony

First, it is important to note that Mr. Zarauskas has never claimed that the prosecutor commented on his decision not to testify at trial.  *See Def.'s Mot.* at 1-16; *Def.'s Reply* at 1-7.  The prosecutor directed his comment during his rebuttal argument only to the Café Vivaldi conversation:

> Now, the defendant says there's not one shred of evidence, not one shred, that the defendant knew that these tusks were illegal.  Well, if he thought they were illegal -- or if they thought -- if he thought they were legal, why couldn't he give a straight answer?  Two hours and nine minutes, not once did he raise his voice or say, I didn't do what you're saying I did.

*4 Trial Tr.* 589:7-13.

Thus, the cases that address prosecutorial comment on a defendant's failure to take the stand are not germane here.  *Rodríguez-Vélez*, 597 F.3d at 44 ("[T]he government infringes the defendant's Fifth Amendment rights whenever 'the language used [by the prosecutor is] manifestly intended or [is] of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify'") (quoting *United States v. Glantz*, 810 F.2d 316, 322 (1st Cir. 1987)); *United States v. Glover*, 558 F.3d 71, 77 (1st Cir. 2009) ("When assessing whether a prosecutor's comments violate the Fifth Amendment guarantee against self-incrimination, we ask whether the language used was manifestly intended or was of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify") (internal quotation marks and

citations omitted); *see also Sepulveda*, 15 F.3d at 1187 (analyzing prosecutors' comments to determine whether they implicated the defendants' "failure to testify").

> **2.** **Prosecutorial Comment on a Defendant's Assertion of the Right to Remain Silent**

Both parties have cited caselaw that addresses a situation not presented here—where a person not in custody asserts his right to remain silent and at trial the prosecutor comments on the defendant's prior refusal to talk. Mr. Zarauskas cites a line of authority springing from *Doyle v. Ohio*, 426 U.S. 610 (1976), which Mr. Zarauskas characterizes as holding that "a single question addressed to the defendant concerning his post-arrest silence did not amount to error under *Doyle* [citation omitted], where the trial court immediately sustained an objection to that question, the court advised the jury to disregard the question and the defense counsel did not request more curative instructions." *Def.'s Mot.* at 11. Mr. Zarauskas also cites *Griffin*, 380 U.S. at 615 and *Greer v. Miller*, 483 U.S. 756 (1987) in support of his motion for a new trial. *Id.*

The *Doyle/Griffin/Greer* line of cases, however, is markedly distinct from this situation. In *Doyle*, the prosecutor cross-examined the defendants about their decision to remain silent after having been given a *Miranda* warning upon arrest. *Doyle*, 426 U.S. at 614 ("Mr. Wood, if that is all you had to do with this and you are innocent, when Mr. Beamer arrived on the scene why didn't you tell him?"). Not surprisingly, the Supreme Court took a dim view of the prosecutor impeaching the defendants because after their arrest and after *Miranda* warnings, they asserted a constitutional right: "We hold that the use for impeachment purposes of petitioners'

17

silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Id.* at 619.

In *Griffin*, the Supreme Court concluded that a California constitutional provision that permitted the court and counsel to comment on a defendant's failure to testify violated the Fifth Amendment. *Griffin*, 380 U.S. at 614 ("For comment on the refusal to testify is a remnant of the inquisitorial system of criminal justice, which the Fifth Amendment outlaws. It is a penalty imposed by courts for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly") (internal quotation marks and citations omitted).

In *Greer*, the Supreme Court further explained *Doyle*. It noted that "*Doyle* rests on 'the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial.'" *Greer*, 483 U.S. at 763 (quoting *Wainwright v. Greenfield*, 474 U.S. 284, 291 (1986), quoting *South Dakota v. Neville*, 459 U.S. 553, 565 (1983)).

Mr. Zarauskas heavily relies on this trilogy to contend that he is entitled to a new trial. *See Def.'s Mot.* at 1-16. However, these cases and their progeny do not assist Mr. Zarauskas. To begin, the Supreme Court has been careful to reiterate that because the "*Doyle* line of cases" rests on the "right-to-remain-silent component of *Miranda*[,] . . . the Constitution does not prohibit the use for impeachment purposes of a defendant's silence prior to arrest, or after arrest if no *Miranda* warnings are

given." *Brecht v. Abrahamson*, 507 U.S. 619, 628 (1993) (citations omitted).  The

*Brecht* Court illustrated the point:

> The first time petitioner claimed that the shooting was an accident was when he took the stand at trial.  It was entirely proper—and probative— for the State to impeach his testimony by pointing out that petitioner had failed to tell anyone before the time he received his *Miranda* warnings at his arraignment about the shooting being an accident. Indeed, if the shooting was an accident, petitioner had every reason— including to clear his name and preserve evidence supporting his version of the events—to offer his account immediately following the shooting.

*Id.*  Here, Mr. Zarauskas has never made any suggestion that he was under arrest

when he gave the Café Vivaldi interview to the agents.  In fact, they told him that he

was not:

> SPECIAL AGENT HOLMES: [Y]ou're welcome to talk to us but you're not under arrest obviously.

*Gov't Ex.* 135 at 52:4-5.  Nor had the agents given Mr. Zarauskas any *Miranda*

warnings:

> SPECIAL AGENT HOLMES: You know, I'm not going to read you your rights.  This is going to be voluntary if you want to continue talking about this.

*Id.* 52:13-16.  As the interview was both pre-arrest and pre-*Miranda*, the *Doyle* line

of cases that underpin Mr. Zarauskas' motion do not apply.

The parties have fenced over the implications of a series of First Circuit

decisions that address the selective assertion of the Fifth Amendment, even in a non-

custodial situation.  A person under investigation for a crime, but not yet charged or

taken into custody, may also assert the privilege against self-incrimination.  *Coppola*

*v. Powell*, 878 F.2d 1562, 1565 (1st Cir. 1989).  In *Coppola*, the First Circuit held that

a criminal suspect's pre-arrest silence, following his express invocation of the Fifth Amendment, could not be used in the Government's case in chief. *Id.* at 1567-68. Similarly, in *United States v. McCann*, the First Circuit considered the propriety of police testimony that a defendant answered some questions during a non-custodial, pre-arrest interview, but refused to answer others. 366 F.3d 46, 56 (1st Cir. 2004), *vacated on other grounds*, *McCann v. United States*, 543 U.S. 1104 (2005), *aff'd following vacatur*, *United States v. McCann*, 517 F.3d 1 (1st Cir. 2005). The *McCann* Court noted that

> we never have addressed the precise question presented in this case: whether the privilege against self-incrimination is implicated when, in the context of a non-custodial interrogation, a suspect selectively refuses to answer a what-is-your-real-name question despite having volunteered answers to other questions that he perhaps believes are less likely to induce an incriminating response.

*Id.* After acknowledging a substantial circuit split on this issue, *id.* at 56-57 (collecting cases), the First Circuit avoided the constitutional question by holding that any error, if it existed, was harmless. *Id.* at 57. The question appears to remain unresolved in the First Circuit. *See United States v. Rodriguez*, 675 F.3d 48, 62 n.17 (1st Cir. 2012) ("We note that the law concerning a prosecutor's use of a defendant's pre-arrest, pre-*Miranda* silence is, to say the least, unsettled").[4]

---

[4]     In *Salinas v. Texas*, 133 S. Ct. 2174 (2013), three Justices of the Supreme Court held that an interviewee must expressly invoke the privilege against self-incrimination to benefit from it later at trial. *Id.* at 2181-82. The plurality opinion stated that "[a] witness does not expressly invoke the privilege by standing mute," *id.* at 2181, and that silence in the face of incriminating questions are not an invocation of the privilege. *Id.* at 2181-82. Two justices, concurring in the judgment, argued instead that *Griffin v. California* was wrongly decided and prosecutors could freely comment on the defendant's pre-custodial silence "even if [the defendant] had invoked the privilege because the prosecutor's comments . . . did not compel [the defendant] to give self-incriminating testimony." *Id.* at 2184 (Thomas, J., concurring). Although the competing opinions in *Salinas* suggest an answer to the question posed by the First Circuit in *McCann*, they do not provide a definitive one.

But Mr. Zarauskas never invoked his right to remain silent, either explicitly or implicitly. Even though an invocation of the right to remain silent "does not depend upon any special combination of words," *Coppola*, 878 F.2d at 1566, the interviewee's "actions must be such that the agency or court can reasonably be expected to understand that he is invoking the privilege." *SEC v. Howatt*, 525 F.2d 226, 230 (1st Cir. 1975). There is no evidence in the record that Mr. Zarauskas ever invoked his right to remain silent during the Café Vivaldi interview, and therefore, the *Coppola/McCann* line of authority does not apply.

### 3. Mr. Zarauskas' Theory of the Case

In *Doyle*, the Supreme Court commented that "unless prosecutors are allowed leeway in the scope of impeachment cross-examination some defendants would be able to frustrate the truth-seeking function of a trial by presenting tailored defenses insulated from effective challenge." *Doyle*, 426 U.S. at 617 n.7. Consistent with this observation, the First Circuit has long held that a prosecutor is permitted to comment on "the plausibility of a defense theory." *United States v. Salley*, 651 F.3d 159, 165 (1st Cir. 2011); *Glover*, 558 F.3d at 78; *see also United States v. Taylor*, 54 F.3d 967, 978 (1st Cir. 1995). When the prosecutor is responding to the defendant's theory of the case, the First Circuit has expressed its "reluctance to find plain error when a prosecutor's remarks are made to rebut specific statements by defense counsel, and are proportionate to that end." *Taylor*, 54 F.3d at 978.

Here, Mr. Zarauskas made it clear from the outset that he contended that the contents of the Café Vivaldi interview exonerated him. *1 Trial Tr.* 33:19-34:9. He urged the jury to conclude that Mr. Zarauskas wanted "to be helpful to the agents"

and to concentrate on "the actual words and the actual sentiment behind them." *Id.* 33:23-34:1. Again, he emphasized that the jury should view the interview as an effort by Mr. Zarauskas "to be helpful, as a good citizen would." *Id.* 34:4-5.

At the close of the trial, when the prosecutor delivered his initial closing argument, his references to the Café Vivaldi interview drew no objection. *4 Trial Tr.* 559:25-575:13. During his responsive closing argument, however, Mr. Zarauskas' counsel drove home his defense theory that the Government had produced "not one iota, not one shred, not one little word that says that Mr. Zarauskas, Andy, knew that those tusks were coming from Canada -- not one word, not one e-mail, not one telephone call, not one conversation." *Id.* 576:23-577:1. Instead, defense counsel insisted that Mr. Zarauskas wanted to be "helpful" during the Café Vivaldi interview, and asked the Government "so what can I do for you?" *Id.* 578:16-17. Defense counsel urged the jury to consider the "human reaction" to being confronted by federal agents:

> [T]he agents suddenly spring on Andy that he's the focus of the investigation. What's the human reaction? You've got three government agents and one or more of them are from Canada sitting there suddenly accusing you of being a tusk smuggler. What are you going to do?
>
> And they want to stretch that -- those natural human reactions into suddenly being accused of these things into some sort of guilt, some sort of guilty statement. But look at that tape. Not once during that entire tape does Andy Zarauskas says -- ever say, yeah, I knew he was bringing them in from Canada.

*Id.* 578:5-15.

In rebuttal, the prosecutor responded to defense counsel's challenge to the Government to produce evidence that Mr. Zarauskas knew the narwhal tusks were

from Canada and his rhetorical questions (i.e., "What's the human reaction?" and "What are you going to do?"). The prosecutor argued:

> Now, the defendant says there's not one shred of evidence, not one shred, that the defendant knew that these tusks were illegal. Well, if he thought they were illegal -- or if they thought -- if he thought they were legal, why couldn't he give a straight answer? Two hours and nine minutes, not once did he raise his voice or say, I didn't do what you're saying I did.

*Id.* 589:7-13. After a sidebar, the prosecutor went on:

> I would ask you to do the very same thing that Mr. Smith asked you to do. Ask yourself, if you were in that situation where you believed you were being falsely accused, what would you do? What would you say?

*Id.* 592:15-18.

This exchange is a textbook example of an able defense lawyer attempting to "present[] tailored defenses insulated from effective challenge." *Doyle*, 426 U.S. at 617 n.7. The defense posed the rhetorical question—what is the ordinary human reaction to being accused of a crime he did not commit? The obvious answer is to deny committing the crime. But, having demanded an answer, the defense seeks to prohibit it. Once the defense proposed his theory and pressed the prosecution to answer his question, the prosecution was free to respond. In his rebuttal, the prosecutor did not comment on Mr. Zarauskas' failure to testify at trial. He responded only to the defense assertions about the admitted interview, and therefore, his "remarks [were] made to rebut specific statements by defense counsel, and [were] proportionate to that end." *Taylor*, 54 F.3d at 978. "By advancing [his] theor[y], [Mr. Zarauskas] opened the door to the statement at issue." *Salley*, 651 F.3d at 165.

## C.     Burden Shifting

Mr. Zarauskas also claims that the Government, by its questioning of Special Agent Guidera, impermissibly placed a burden on him to prove his innocence.  *Def.'s Mot.* at 2.  Specifically, he objects to the following exchange between the prosecutor and Special Agent Guidera:

> Q     During the interview, did the defendant ever say anything like you're accusing me of something I didn't do here?
>
> A     No, he didn't.
>
> . . .
>
> Q     Did he ever get mad at you or say that you misunderstood what happened?
>
> A     No.

*Id.* (quoting *2 Trial Tr.* 114:19-115:2).  He also objects to this passage from the prosecution's rebuttal argument:

> Now, the defendant says there's not one shred of evidence, not one shred, that the defendant knew that these tusks were illegal.  Well, if he thought they were illegal -- or if they thought -- if he thought they were legal, why couldn't he give a straight answer?  Two hours and nine minutes, not once did he raise his voice or say, I didn't do what you're saying I did.

*Id.* at 4 (quoting *4 Trial Tr.* 589:7-13).

The Court does not agree with Mr. Zarauskas that a burden was shifted to him based on either the exchange with Special Agent Guidera or the rebuttal argument. This series of questions was directed at a critical issue: what the jury should make of Mr. Zarauskas' interview.  At the end of trial, the Court instructed the jury, without objection, about Mr. Zarauskas' prior statements:

> You have heard evidence that Andrew Zarauskas made statements in which the government claims he admitted certain facts.  It is for you to

decide, one, whether Mr. Zarauskas made the statements; and, two, if so, how much weight to give it or them. In making those decisions, you should consider all of the evidence about the statements, including the circumstances under which the statements may have been made and any facts or circumstances tending to corroborate or contradict the version of events described in the statements.

*4 Trial Tr.* 536:11-20.

Thus, the jury was required to evaluate the evidentiary impact of Mr. Zarauskas' Café Vivaldi interview. Beginning with the exchange between the prosecutor and Special Agent Guidera, the two questions to which Mr. Zarauskas objects were part of a string of questions in which the prosecutor asked Special Agent Guidera about Mr. Zarauskas' physical reaction during the interview; Special Agent Guidera answered that he sweated, though the temperature in the room was not uncomfortable; he did not raise his voice; he became tense and his breathing became rapid and shallow. *2 Trial Tr.* 114:9-115:2. This was relevant and competent testimony based on Special Agent Guidera's direct observations of Mr. Zarauskas. The prosecutor's questions about whether Mr. Zarauskas issued any denials during the interview went directly to the jury's evaluation of the circumstances and content of the statements. Moreover, by the time the prosecutor asked Special Agent Guidera about Mr. Zarauskas' lack of denials, the entire interview had already been played to the jury, and therefore, the prosecutor was asking Special Agent Guidera only to confirm what was already in evidence.

Turning to the prosecutor's rebuttal, as the Court noted earlier, the prosecutor is allowed to highlight the failure of the defendant to present evidence to back up his theory of the case. *Salley*, 651 F.3d at 165-66 (holding that no burden shift occurred

25

when the prosecution said "[t]here's been no suggestion that Mr. Salley did not know [a contraband gun] was there," because this addressed the defendant's theory that he did not know about the gun); *United States v. Savarese*, 649 F.2d 83, 87-88 (1st Cir. 1981) (holding that no burden shift occurred when a non-testifying defendant put forth an alibi witness, and the Government disparaged the credibility of the witness and attacked the evidentiary foundation of the alibi). Here, the prosecutor argued that Mr. Zarauskas did not act in a manner consistent with his defense theory: that he did not know the narwhal tusks were imported illegally. The prosecutor's rebuttal argument thus attacked the sufficiency of the evidence supporting that theory. None of his language shifted a burden to Mr. Zarauskas. The prosecutor does not refer directly or indirectly to Mr. Zarauskas having a burden of proof. This part of the prosecutor's argument merely highlighted the inconsistency between the interview and the defense theory.

Finally, the Court explicitly and repeatedly instructed the jury on the presumption of innocence and the Government's burden to prove Mr. Zarauskas' guilt beyond a reasonable doubt. *4 Trial Tr.* 532:2-533:12, 544:16-22, 546:10-19, 551:24-552:6, 554:9-555:22, 556:22-557:3. The Court differentiated between the Government's burden of proof and the two affirmative defenses on which Mr. Zarauskas bore a burden of proof. *Id.* 533:13-534:3; 557:4-558:5. It emphasized that apart from these two issues, the Government "must prove each of the elements of each charged crime beyond a reasonable doubt." *Id.* 534:2-3. During his closing argument, Mr. Zarauskas' defense counsel stressed to the jury that the Government

bore the burden of proof and that the legal standard was beyond a reasonable doubt. *Id.* 582:12-583:20. Even if Mr. Zarauskas' interpretation of these passages were correct, it would be harmless error; the Court instructed the jury in exacting and repetitive detail that the burden lay on the Government to prove Mr. Zarauskas guilty beyond a reasonable doubt. *See United States v. Tajeddini*, 996 F.2d 1278, 1284-85 & n.7 (1st Cir. 1993) ("[T]he court gave a sufficient charge on the presumption of innocence to dispel any improper suggestion which the jury might have taken from the [prosecutor's] argument").

## D. Conclusion

Because Mr. Zarauskas has not shown any constitutional violation or error of law in the prosecutor's examination or his closing arguments, there is no ground on which to grant a new trial under Federal Rule of Criminal Procedure 33(a).

## V. CONCLUSION

The Court DENIES Mr. Zarauskas' Motion for a New Trial (ECF No. 158).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 17th day of September, 2014